(47 Misc. Rep. 552.)

## In re SIMON'S WILL.

(Surrogate's Court, Saratoga County. June, 1905.)

WILLS—TESTAMENTARY CAPACITY.

> Evidence in proceedings for the probate of a will considered, and *held*, that probate was properly denied because of the showing of want of testamentary capacity on the part of testatrix.

In the matter of the last will of Cornelia Simon. Proceedings for the probate of a will. Probate denied.

Frisbie & Terk, for proponent.

James T. Brusnihan and James R. Stevens, for contestant.

LESTER, S. A paper purporting to be the last will and testament of Cornelia Simon has been offered for probate by Phillis Davis, the executrix and sole legatee named therein. It is alleged to have been executed by the testatrix on Saturday, the 31st day of December, the day before her death, which occurred Sunday night about midnight. The decedent, who was able to read and write, subscribed the will by making her mark, and Mr. Terk, the lawyer who drew it, wrote her name, Cornelia Hutchinson Simon, though her husband says she never had a middle name to his knowledge.

Mr. Terk testifies that she told him her name, but that she did not say her last name very distinctly, so he asked her how she spelled it, and she spelled it for him. Her first name he understood immediately. The decedent had been suffering for several weeks from a fistula, which had culminated in a large abscess. Dr. Gillette, the female physician who attended her, had not dared to open the abscess owing to her low condition, and it had caused her leg to swell to a great size, and had given her such excruciating pain that the physician had resorted to morphine to control it. This she had administered in gradually increasing doses, and she testified that on the morning the instrument offered for probate was drawn (at about 11 o'clock) she had given the patient a half grain of morphine, the effect of which, she testified, would have lasted for 20 hours; in consequence of which, and of her exhausted condition, and the cumulative effect of preceding doses of morphine that had been given her, she would have been mentally incapable of under-

standing the nature or character of such an act as the dictating or execution of a will, or the publication of a will, on the afternoon of the same day between 2 and 3 o'clock. Mr. Terk testifies that he went to the Phi Gamma Delta fraternity house, in the city of Schenectady, at the request of Mrs. Gillette, Dr. Gillette's mother, about 11 o'clock Saturday morning, and found the decedent in bed. Phillis Davis was not there, but came into the room in a few seconds. He did not draw the will then, though he had a blank for the purpose, because he was ordered out by Mrs. Simon's husband, although he told Simon that she had sent for him. At that time she told Mr. Terk she had a bank account in the Adirondack Trust Company, and some household property at Saratoga, and some jewelry, and also told him (what is conceded to be a fact) that the piano in the house at Saratoga was not paid for, and that the parties of whom she purchased it might take it back. She told him she had the bankbook, and took it from beneath her pillow, and gave it to him, and he had it in his hand when Mr. Simon came in and ordered him out. She was very ill, and spoke indistinctly. Mr. Terk says he met Dr. Gillette at the door, who told him to ask for Mrs. Davis. He suspected that Mrs. Simon's husband would not want a will drawn, and he therefore did not tell the purpose of his visit. As he was leaving, Mrs. Simon asked him to come again. Simon threatened him if he should return, but he went back with Mr. Rogers and a policeman between 2 and 3 o'clock the same afternoon, when he found no one at all in the sick woman's room. She appeared to be sleeping when he entered the room, but soon opened her eyes, and told him she was glad he had come; that Mr. Simon was very angry that morning. In answer to his questions, she said she wanted him to draw her will; that she had no relatives but her husband, and that he had no relatives; that she wanted her property left to Mrs. Davis. Mr. Terk asked her whether Mrs. Davis was the woman attending her, and who was there in the morning, and she said yes. She said her husband had been unkind to her; that she always had to work, and he never cared anything for her, and she did not want to leave him anything. She said he had a watch which she had given him, and she was willing to let him have that, but she didn't want to give him any part of the furniture, nor anything at all. She said Mrs. Davis was not related to her. Mr. Terk then drew the will, and read it over to her. She told him she wanted her dresses put in and several articles, and he told her that would cover them. She then said, "All right; I am satisfied; now I am ready to join my Maker," or something to that effect. He says he had less difficulty in understanding her than in the morning. She said she was not able to write her name, so he wrote it for her, and she took hold of the pen in making her mark, and said she could see the paper, and could see where she was writing. She said she wanted Mr. Rogers and Mr. Terk to sign as witnesses, and when that was done they went away, after having been there between 20 minutes and half an hour. Mr. Terk says the decedent was, so far as he was able to judge, perfectly rational.

Mr. Rogers, the other witness, who went at Mr. Terk's request, testifies to substantially the same facts as to the execution of the will. He had never seen the testatrix before. Mr. Terk told him who she was. He remembers the substance of the will, which Mr. Terk read

over in his presence. He says Mrs. Simon was in bed, and he would judge she was very ill and close to death. She seemed to.speak freely, but indistinctly and very low. She seemed very weak. Mr. Terk asked her if he should keep the will, and she said "Yes."

Dr. Gillette, who. had been attending the deceased since the 21st of December, testified that she was with her for 20 minutes on Saturday morning before Mr. Terk saw her, and that she left her stupefied by morphine and in a comatose state; that she considered her then in a dying condition, not rational, and incapable of understanding the execution of a will. Mrs. Davis was there at the time, and said that Mr. Simon had been very unkind to Mrs. Simon, and, turning to Mrs. Simon, said, "Is not that so, sweetie?" Mrs. Simon opened her eyes, but said nothing. Dr. Gillette testified that Mr. Simon did what she suggested for his wife's comfort, and made suggestions himself. Her testimony shows he treated her kindly during her last illness, and the counsel for the proponent concedes this to be the fact in the brief they have submitted. Dr. Gillette also testifies that Mrs. Simon said Mr. Simon was a kind husband. She said this in his presence when Dr. Gillette first saw her. The doctor also testified that Mrs. Davis told Mrs. Gillette, her mother, in her presence, that Mr. Simon had always abused his wife, was an unkind and cruel husband, and that she (Mrs. Davis) wished her will to be made giving her money away from him. This was Saturday, in the afternoon of the day Mr. Terk had been to see Mrs. Simon, and it occurred in Dr. Gillette's office.

Albert H. Cantwell, the member of the fraternity who employed Mr. and Mrs. Simon in Schenectady, and who saw them every day, testified that they had been there since the opening of the college year; that their manner toward each other had been friendly and intimate, and like that of man and wife, except on one occasion, when Simon spoke angry words to her, and they had, to use the language of the witness, "a passing scrap, all over next day."

Mrs. Vass, a colored woman, testified that Mr. Simon asked her to come and see his wife, and she was there over a week, not regularly, but off and on, and saw Mrs. Simon for the last time the Friday before her death; that the first time she saw her Mrs. Simon told her that her husband was very kind to her, and that she had everything she needed; that the witness spoke to Mr. Simon about bringing in a doctor, and he said he would be glad if she would, so she called in Dr. Gillette; that on the doctor's suggestion Mr. Simon arranged for his wife to go to the hospital, but she objected, and he said "Do as you like," and told the hospital attendants who had come for that purpose not to take her; that Mr. Simon addressed his wife as "my dear," and she addressed him in the same manner; that after the doctor had told the witness that Mrs. Simon could not live, she asked Mrs. Simon if she had any relatives, and Mrs. Simon said she had left everything to Mr. Simon, and she had no relatives; that she saw Phillis Davis there for the first time on Thursday before Mrs. Simon's death, at about 6 o'clock in the afternoon; that on Friday Mrs. Simon would say things, and the witness would ask if she was speaking to her, and Mrs. Simon would shake her head, and when witness asked if she knew her she made no answer.

John J. Simon, the husband of the decedent, testified that they had been married 14 years, and all their married life had lived together; that he had never known Phillis Davis until he was looking for some one to wash the linen at the club where he was employed, and some one told him she did washing. That was just before election. She came to the house four times to get her money, and his wife saw her at such times. Soon after election, Mrs. Davis went to New York. After Mrs. Simon got pretty low, and her husband had been sitting up at night with her for several weeks, he asked the doctor to help him to get somebody to relieve him in the kitchen. Being unable to get any one, he sent for Mrs. Davis, who came from New York Thursday evening about 6 o'clock before Mrs. Simon's death. The same evening after supper he took her to the room where his wife was, and she stayed there about three hours. He was there himself at the time. Friday he came to Saratoga on business, and left Phillis Davis in the house. He was away for three hours. When he got back she was down in the kitchen. On Saturday she was also in the kitchen. On Saturday he saw Mr. Terk asking for Mrs. Simon, and told him she was upstairs. He didn't know what he wanted. He was then talking to Dr. Gillette, and afterward went up to his wife's room, and found Mr. Terk and Mrs. Davis there. Mr. Terk had a bankbook, and started to give it to Mrs. Davis, and would not give it to the witness. The bankbook was kept in the satchel under the bed, and his wife could not get out of bed. Mrs. Davis took the book, and threw it on his wife's bed, and witness took it, and ordered Mr. Terk out of the room, and showed him the doorway and he went out. He knew nothing of Mr. Terk's coming back afterward, and first heard that the will had been made when he received notice from the surrogate's office.

E. T. Rulison, a physician who has practiced medicine nearly 30 years, testified that one-half a grain of morphine administered to a person in Mrs. Simon's condition would produce at first a stimulating effect lasting for an hour, and then a soporific effect, from which, however, the patient could be aroused; that if the patient could answer a question intelligently before the dose, she could do so afterward.

Phillis Davis, the proponent, was not sworn.

Although Mrs. Simon had the right to make a will bestowing all her goods upon a stranger, and leaving nothing to the husband with whom she had lived for 14 years, it strikes one as improbable that she should wish to do so. Yet, if the instrument now offered for probate is to be taken as the expression of her testamentary intention, that is precisely what she did. If Mrs. Davis had been an old friend, or had performed some notable service for Mrs. Simon, it would seem more credible that she should have wished to leave her property to her; but it appears that she concluded to make Mrs. Davis, who was almost a stranger, the sole recipient of her bounty within 36 hours after Mrs. Davis had come from New York, upon her husband's employment, to attend to the kitchen work, so that he might be able to devote his time to caring for his wife. Under such circumstances, it seems necessary to find some reasonable explanation of the decedent's determination to bequeath her property as provided in the instrument now under consideration. Matter of Budlong, 54 Hun, 131, 7 N. Y. Supp. 289. Mrs.

Davis proclaimed her own desire that Mrs. Simon should leave her property away from her husband, because her husband was unkind to her. She told Dr. Gillette that Mr. Simon was very unkind to his wife in the latter's presence, and then, turning to Mrs. Simon, said, "Is not that so, sweetie?" but Mrs. Simon did not answer. Nevertheless, Mrs. Simon told Mr. Terk the next morning that her husband had been unkind to her; that she always had to work, and he never cared anything for her, and that she did not want to leave him anything. The proof, however, fails to reveal any unkindness on the part of Simon toward his wife; on the contrary, it shows kind treatment of her, and before the advent of Mrs. Davis, Mrs. Simon had told those who attended her that her husband was kind to her. There is no evidence that she had ever said to any person that he had been unkind, except on Saturday, when she told Mr. Terk so. Mrs. Davis, the only person now living who has affirmed a knowledge of any unkindness toward Mrs. Simon on the part of her husband, was not sworn as a witness, and her failure to appear and disclose her knowledge upon that subject is significant.

The testimony of Mr. Terk and Dr. Gillette, the two principal witnesses, is absolutely irreconcilable. In my opinion, both were mistaken. Mr. Terk was mistaken in thinking Mrs. Simon more rational than she really was. Dr. Gillette was mistaken in estimating the effect of the drug that had been administered, and in supposing that on Saturday morning Mrs. Simon was in a state of coma. I think Mrs. Simon was in partial possession of her mental faculties, but that she was suffering from a delusion, which was derived from the hallucinations that attend upon the use of morphine, or arose from the progress of her disease and the approach of death, or was induced by the suggestions of Mrs. Davis. The delusion was that her husband was unkind to her. It is a peculiarity of a delusion that it may be confined to a single subject, and that as to other things the mind may be normal. The correct information given to Mr. Terk by Mrs. Simon about her property and other affairs is not inconsistent with such a delusion as she seems to have cherished respecting her husband's conduct toward her. Acting under this delusion, she gave directions for her will, and the provisions of the instrument that is now offered for probate are the product of disease and drugs, and not the product of a sound mind.

I am not satisfied that the questions of Mr. Terk relating to the execution of the instrument offered for probate were intelligently answered by the deceased, and that she adopted the suggestions they embodied so as to make them her own acts and declarations. Matter of Coop (Sup.) 6 N. Y. Supp. 664. I think, therefore, that probate should be refused to the paper now offered as the last will and testament of the deceased, and that a decree should be entered accordingly.

Probate denied.